UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION

CIVIL ACTION NO.: 1:06CV-165-M

HOLLEY PERFORMANCE PRODUCTS, INC.                    PLAINTIFF

v.

SMITH-CNC CHINA NETWORK COMPANY, et al.              DEFENDANTS

MEMORANDUM OPINION AND ORDER

This matter is before the Court on cross-motions by the defendants, Smith-CNC China

Networking Co., SmithCNC, LLC, and Douglas R. Smith (collectively "Smith-CNC") [DN 86], and

the plaintiff, Holley Performance Products, Inc. ("Holley") [DN 93], for partial summary judgment.

Also before the Court is a motion by the defendants for oral arguments [DN 108].  Fully briefed,

these matters are ripe for decision.

## I.  INTRODUCTION

The facts underlying this dispute were set forth in the Court's Memorandum Opinion

granting Holley's motion for a preliminary injunction [DN 19].  It will suffice to note here that

Holley and Smith-CNC brought tort and contract claims against each other and that the present

cross-motions for summary judgment relate to each of those claims.

## II.  SUMMARY JUDGMENT STANDARD

In order to grant a motion for summary judgment, the Court must find that the pleadings,

together with the depositions, interrogatories and affidavits, establish that there is no genuine issue

of material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56.  The moving party bears the initial burden of specifying the basis for its motion and of

identifying that portion of the record which demonstrates the absence of a genuine issue of material

fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party is required to do more than simply show there is some "metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Co., 475 U.S. 574, 586 (1986).  The Rule requires the non-moving party to present "specific facts showing there is a genuine issue for trial."  Fed.R.Civ.P. 56(e).  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]."  Anderson, 477 U.S. at 252.

### III.  DISCUSSION

### A.  Breach of Contract

Both parties assert claims for breach of the Holley Performance Products Agreement (the "Contract").  Holley alleges that Smith-CNC breached the Contract by repeatedly delivering defective components.  Smith-CNC alleges that Holley breached the Contract by failing to pay for the component parts delivered by Smith-CNC.  Furthermore, Smith-CNC alleges that Holley breached the Contract by violating its exclusivity provisions.  To succeed on their claim for breach of contract, each party must establish: "(1) the existence of a valid contract; (2) breach of the contract; and (3) damages or loss to plaintiff."  Sudamax Industria e Comercio de Cigarros, Ltda v. Buttes & Ashes, Inc., 516 F. Supp. 2d 841, 845 (W.D. Ky. 2007).  There is no dispute that a valid contract existed between the parties.  The primary issues addressed in each party's motion are (1) which party breached the Contract and (2) whether that party has been damaged as a result.

2

### 1. *Contractual Requirements*

The Contract provided that:

Smith-CNC represents and warrants to Holley that: . . . Each item of the Products (i) is merchantable, of good quality and fit for the particular purposes for which such item is sold, . . . (iii) conforms to each of the samples thereof provided by Smith-CNC to Holley and approved in writing by Holley, [and] (iv) meets all of Holley's specifications therefor as communicated in writing to Smith-CNC . . . .

(Contract § G.1(c).)  Under the Contract, Smith-CNC was to ship intake manifolds, water pumps, and flanges to Holley.  Upon delivery, Holley had "the right, but not the obligation, at its sole discretion and expense to inspect and test any quantity" of the delivered goods.  If Holley exercised its right to inspect the goods and discovered that the goods did not conform to the warranty identified in § G.1(c) of the Contract, Holley was required to "submit a notice to Smith-CNC that provide[d] a summary of such Defective Products in the shipment."  (Contract § G.2(a).)  Upon sending a defective products notice, Smith-CNC could instruct Holley to "either return or destroy the Defective Products."  Holley could then instruct Smith-CNC to "either promptly credit the account of Holley or, no later than 30 days after receipt by Smith-CNC of the Defective Product Notice, furnish acceptable replacement Products to Holley."  (Id.)  It is undisputed that Holley sent Smith-CNC many defective product notices generally via email.  It is unclear from the record, however, whether Holley requested that Smith-CNC furnish acceptable replacement products or whether Holley instructed Smith-CNC to credit the account for the cost of the product that was allegedly defective.  (See, e.g., Mitchell Dep. 67:21-68:9 June 7, 2007 (indicating that if Holley believed the parts delivered were defective, it would place another order for the same products and would also issue a debit memo).)

### 2. Holley's Claim

Holley contends that it is entitled to summary judgment on its own claim for breach of contract because the undisputed facts show that Smith-CNC breached the Contract. It contends that Smith-CNC materially breached the Contract by repeatedly sending defective products. Accordingly, Holley terminated the Contract under § A.2(a)(ii) which provided that "Holley may terminate this Agreement immediately upon written notice to Smith-CNC if Smith-CNC . . . repeatedly fails to comply with any [obligation under the Contract] whether or not cured . . . ." (Contract § A.2(a)(ii).) Although it is undisputed that Holley had issues with the products supplied by Smith-CNC, the record does not establish, as a matter of law, that Smith-CNC breached the Contract. Other than attaching affidavits, defective product notices, and deposition excerpts by Holley's current and former representatives which conclude that the products were defective, Holley has not sufficiently identified the underlying facts which show how such products failed to conform to the contractual requirements. Although this is certainly sufficient evidence for Holley to get past summary judgment, it is simply insufficient to establish that Holly, as the claiming party, is entitled to relief on its claim as a matter of law. See Sparton Tech., Inc. v. Util-Link, LLC, 248 F. App'x 684, 692 (6th Cir. 2007) (unpublished) (whether goods were manufactured in a workmanlike manner is generally a question for the jury). Furthermore, Smith-CNC disputes that the goods in question did not conform to the Contract. For example, Smith testified that many of the issues that Holley was experiencing, such as with product quality and shipping delays, were the result of Holley's own actions. (Smith Dep. 49-50 July 17, 2008). Smith also testified that many of the issues identified by Holley were not based on products delivered under the Contract, but were rather based on samples of pre-production parts. (Id. 51-52.) This evidence creates genuine issues of material fact

4

precluding summary judgment in Holley's favor.  Consequently, there is a genuine issue of material fact as to whether Holley had the right under § A.2(a)(ii) to terminate the Contract.

Likewise, summary judgment in favor of Smith-CNC on Holley's breach of contract claim is not appropriate.  Smith-CNC first contends that summary judgment should be granted in its favor because Holley never notified Smith-CNC of a defect on a document entitled "Defective Products Notice."  Smith-CNC's argument fails because the Contract did not require that Holley notify Smith-CNC in such a manner.  Instead, the Contract only required that Holley submit a notice to Smith-CNC of a summary of the defective products.  (Contract § G.2(a).)  The Contract permitted such notices to be sent in electronic form, such as via email.  (See id. § P.iv.)  Next, Smith-CNC argues that the Contract limited Holley to two remedies.  According to Smith-CNC, Holley could either request that Smith-CNC cure the defect or could request that Smith-CNC credit Holley's account for the value of the delivered goods.  Under the Uniform Commercial Code, parties are allowed to provide for remedies in addition to those otherwise available under the code.  See KRS 355.2-719(1)(a).  Contrary to the position of Smith-CNC, "resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy."  KRS 355.2-719(1)(b).  The Official Comment to § 2-719 provides that "Subsection (1)(b) creates a presumption that clauses prescribing remedies are cumulative rather than exclusive.  If the parties intend the term to describe the sole remedy under the contract, *this must be clearly expressed*."  Id. cmt. 2 (emphasis added).  The language did not clearly express that the contractual remedies were exclusive.  In fact, the plain language of the Contract provided that Holley could choose either of the remedies provided for in § G.2(a) of the Contract "without waiving any of Holley's rights or remedies under this Agreement . . . ."

### 2. *Smith's Claim*

Holley also seeks summary judgment on Smith-CNC's counterclaim for breach of contract. It argues that Smith-CNC, as the party that failed to perform the Contract, cannot recover for a breach of the Contract. Specifically, Holley claims that it is improper for Smith-CNC to recover for unpaid invoices for products that were delivered in a defective condition. However, as previously noted by the Court, there is a genuine issue of material fact as to whether the goods were delivered in a condition that did not conform to the Contract. Furthermore, even if the goods were defective, KRS 355.2-709 provides that "[w]hen the buyer fails to pay the price as it becomes due the seller may recover . . . the price . . . of goods accepted . . . ." KRS 355.2-709(1)(a). In other words, if Holley accepted the goods, Smith-CNC is entitled to recover the full contract price for the goods. Thomas & Betts Corp. v. A&A Mech., Inc., No. 2003-CA-001833-MR, 2004 Ky. App. LEXIS 339, at *9-13 (Ky. Ct. App. Nov. 24, 2004); KRS 355.2-709(1)(a). This is true even where Holley can otherwise recover for breach of warranty under KRS 355.2-714(2). Id. For these reasons, summary judgment in favor of Holley is not appropriate.

### B. Holley's Defamation Claim

Holley alleges that after it terminated the contract, the defendants conducted a "defamation campaign" against Holley. In particular, Holley focuses on three written publications made by the defendants which Holley claims are defamatory. The first such publication occurred on July 24, 2006 in an email between Smith and a representative of Taurus.[1] The email stated: "Richard: I told you good luck getting paid by Holley now there going to stiff me for close to $300,000 be careful."

---

[1]     Taurus is a company hired by Holley after it terminated the Contract with Smith-CNC to perform similar duties to those provided by Smith-CNC.

6

(Pl.'s Ex. 21) (hereinafter "Taurus Email").   The second communication occurred on or about

October 11, 2006 in an email to various Chinese suppliers.   The email stated

> Dear supplier:
>    As you are aware Holley Owes SmithCNC over 2,400,000rmb.  All tooling
> belongs to SmithCNC and is NOT to be used or any parts from these tools to be
> shipped until this is settled.  All business with Holley is to be stopped until written
> notice.  We are in the process of getting a court order to this effect and consider this
> effective from today.
>    We are in negotiations with Holley and do not want to see a supplier get
> caught in the middle.  For your protection Stop all dealings until further notice.
>    What Holley did was wrong and this must stop or you may be there next
> target.  We appreciate your support on this matter and will support you with new
> business.
>    Thanks!
>    SmithCNC

(Pl.'s Ex. 20) (hereinafter "Supplier Email").  The final communication alleged to have been made

by Smith was published in the Bowling Green Daily News on or about December 3, 2006 (Pl.'s Ex.

24) which was quoted by the China Law Blog soon thereafter (Pl.'s Ex. 25.)  In the article, Smith

was quoted as saying:

> In my last trip to China, I went to all the suppliers and repossessed their tooling . .
> . .  We had a counterproposal on the table on a Thursday night, but by Friday
> morning, I had a FedEx package on my front porch with a lawsuit to get their tooling
> back that they didn't pay for . . . The judge gave them a temporary restraining order
> to give the tools back that Holley hasn't paid for . . . .  And they're trying to put me
> in jail right now.  It's absolutely amazing, they're trying to put me out of business.
> It's like legal stealing.

(Pl.'s Ex. 24) (hereinafter "Newspaper Article").  There is no dispute that these statements were

made by Smith, that the statements referenced the plaintiff, or that the statements were intentionally

published by Smith.  The parties only dispute whether the statements are defamatory or otherwise

privileged.  Holley asserts that it is entitled to summary judgment as to liability because as a matter

of law the statements are defamatory per se.  Smith-CNC contends that it is entitled to summary

judgment because, as a matter of law, the statements are not defamatory.  Furthermore, Smith-CNC asserts that these statements are all opinion entitled to an absolute privilege.

Generally, it is for the Court to determine whether a given statement is defamatory and actionable per se.  Yancey v. Hamilton, 786 S.W.2d 854, 858 (Ky. 1989); see also Deitchman v. Bowles, 166 Ky. 285, 179 S.W. 249, 249 (1915)).  Similarly, "'[t]he determination of the existence of privilege is a matter of law . . . .'" Stringer v. Wal-Mart Stores, Inc., 151 S.W.3d 781, 796 (Ky. 2004) (quoting Columbia Sussex Corp. v. Hay, 627 S.W.2d 270, 276 (Ky. Ct. App. 1981)).  Here, the Court need not determine whether the above statements are defamatory and actionable per se.  The statements are absolutely privileged as opinion and therefore not actionable in a defamation claim.  Pure opinion "occurs where the commentator states the facts on which the opinion is based, or where both parties to the communication know or assume the exclusive facts on which the comment is clearly based."  Id.  This type of opinion is not actionable because "[t]he reader is in as good a position as the author to judge whether the conclusion" reached by the author was correct.  Lassiter v. Lassiter, 456 F. Supp. 2d 876, 882 (E.D. Ky. 2006).  Furthermore, statements of opinion are not actionable unless the opinion "'implies the allegation of undisclosed defamatory facts as the basis for the opinion.'" Yancey, 786 S.W.2d 854, 857 (quoting Restatement (Second) Torts § 566).

The Court finds that the Taurus Email is privileged because it is merely expressing Smith's opinion that Holley is about to "stiff" him out of $300,000.  Smith was merely expressing his frustration.  There is nothing that implies the allegation of undisclosed defamatory facts in this context.  Furthermore, Smith's statement telling Taurus "good luck getting paid by Holley" may have been in bad taste, but again, does not imply anything more than Smith's frustration.  The Supplier Email is also not actionable because it is expressing Smith's pure opinion.  Whether Holley

8

did anything wrong, as suggested by Smith in his email, can be determined by the reader of the email based on the other comments made by Smith in the email. The Court also finds that the statements made in the Newspaper Article are pure opinion which are absolutely privileged. In reference to this Court's injunction ordering Smith to return the tooling to Holley, Smith stated, "It's is like legal stealing." The facts upon which Smith's conclusion is reached are made known to the reader in the article. For example, Smith is also quoted in the article as saying that "in my last trip to China, I went to all the suppliers and repossessed their tooling." He indicated that by the next morning, Holley had served Smith with a lawsuit seeking to recover that tooling and that the Court ordered him to return to the tooling. From these facts, the reader of the article can determine whether Smith's conclusion, that "It's like legal stealing," is correct. Therefore, the statements made by Smith in the Taurus Email, the Supplier Email, the Newspaper Article, and the China Law Blog are not actionable. Therefore, summary judgment in favor of Smith-CNC on each of Holley's defamation claims will be granted.

### C. Tortious Interference

Each party claims that it either had current or prospective contractual relations with the Chinese suppliers. Each party contends that the other party intentionally interfered with those relations. In order to recover under this cause of action, each party must plead and prove the following elements: "(1) the existence of a valid business relationship or its expectancy; (2) defendant's knowledge thereof, (3) an intentional act of interference; (4) an improper motive; (5) causation; and (6) special damages." Monumental Life Ins. Co. v. Nationwide Ret. Solutions, Inc., 242 F. Supp. 2d 438, 450 (W.D. Ky. 2003) (citing CMI, Inc. v. Intoximeters, Inc., 918 F. Supp. 1068, 1080 (W.D. Ky. 1995)).

9

### 1. *Holley's Claim*

By sending the Supplier Email to the Chinese suppliers with whom Holley had a relationship, Holley alleges that Smith-CNC tortiously interfered with those relationships. Each party contends that it is entitled to summary judgment on Holley's tortious interference claim. It appears that there is no issue as to whether Smith-CNC was aware of Holley's relationship with the Chinese suppliers or that the act he took in sending the Supplier Email was intentional. The parties dispute, however, whether the relationship between Holley and the Chinese suppliers was sufficient to establish the first element of the claim. Under <u>Restatement (Second) Torts</u> § 766B as adopted by Kentucky, Smith-CNC contends that the first element of a tortious interference claim is only satisfied if Holley literally intended to enter into "contractual relations" with the Chinese suppliers. Smith reads the phrase "contractual relations" too narrowly. "The expression, prospective contractual relation, is not used in this Section [766B] in a strict, technical sense. It is not necessary that the prospective relation be expected to be reduced to a formal, binding contract. It may include prospective quasi-contractual or other restitutionary rights or even the voluntary conferring of commercial benefits in recognition of a moral obligation." <u>Id.</u> cmt. c. Although Smith-CNC reads this element too narrowly, the record is unclear as to the actual nature of the relationship between Holley and the Chinese suppliers and whether it was sufficient to establish the first element of the tort.

Furthermore, there is a genuine issue of material fact as to whether Smith-CNC acted with an improper motive. To establish this element, Holley must show "malice or some significantly wrongful conduct" on the part of Smith. <u>Nat'l Collegiate Athletic Ass'n v. Hornung</u>, 754 S.W.2d 855, 859 (Ky. 1988). Establishing that Smith-CNC intentionally interfered with the prospective business relationship is insufficient, on its own, to establish this element because "some element of

10

ill will is seldom absent from intentional interference." Id. (quotation omitted). Many times "the defendant has a legitimate interest to protect," and if that is the case, "the addition of a spite motive usually is not regarded as sufficient to result in liability." Id. (quotation omitted). Holley has presented evidence that Smith-CNC may have improperly interfered with the contract. However, it is for the jury, after weighing various factors set forth in Hornung, to determine whether Smith's conduct was actually improper. Id. at 858. Furthermore, even if Smith-CNC's conduct was improper, he "may escape liability by showing that he acted in good faith to assert a legally protected interest of his own." Id. Here, Smith-CNC asserts that it had a legitimate interest to protect because under the Contract, Holley was not permitted to directly or indirectly order products from Smith-CNC's suppliers. As noted above, there is a genuine issue of material fact as to whether Holley properly terminated the Contract in accordance with § A.2(a)(ii). Therefore, summary judgment is not appropriate for either party.

### 2. Smith-CNC's Claim

Smith-CNC contends that Holley tortiously interfered with Smith-CNC's contractual relationship with its Chinese suppliers by violating the exclusivity provisions of the Contract. Specifically, § M of the Contract provided that "during the term of this Agreement and for a period of one year thereafter, neither Holley nor any Affiliate thereof may, directly or indirectly, order Products from any Manufacturing Facility or domestic corporation for which Smith-CNC serves as a distributor . . . ." (Contract § M.) Because Holley began ordering from Chinese suppliers with whom Smith-CNC had a contract, Smith-CNC contends that Holley tortiously interfered with those contracts. Holley contends that summary judgment should be entered in its favor on Smith-CNC's tortious interference claim because there is no evidence that its conduct was improper and because

11

the exclusivity provisions of the Contract no longer applied after Holley terminated the Contract. Assuming, as the Court must, that Holley improperly terminated the Contract, Smith-CNC has presented no evidence that Holley, when it entered into subsequent relationships with the suppliers, was acting with an improper motive.  Establishing that a party intentionally interfered with a contractual relationship, does not, by itself, establish that the party was acting with an improper motive.  Hornung, 754 S.W.2d at 859.  Summary judgment dismissing Smith-CNC's tortious interference claim is warranted.

### D.  Implied Covenant of Good Faith and Fair Dealing

Each party claims that the other breached the implied covenant of good faith and fair dealing and has asserted independent causes of action for those alleged breaches.  Kentucky recognizes that under various circumstances parties to a contract can assert an independent cause of action for a breach of this implied covenant.  See, e.g. Farmers Bank & Trust Co. v. Willmott Hardwoods, Inc., 171 S.W.3d 4, 11 (Ky. 2005) ("Within every contract, there is an implied covenant of good faith and fair dealing, and contracts impose on the parties thereto a duty to do everything necessary to carry them out.").  In a contract for the sale of goods, this duty is recognized by statute.  KRS 355.1-304 ("Every contract or duty within the Uniform Commercial Code imposes an obligation of good faith in its performance and enforcement.").  The official comments to § 1-304 make clear, however, that when the contract is one for the sale of goods, there is no independent cause of action for a breach of that duty:

> This section does not support an independent cause of action for failure to perform or enforce in good faith.  Rather, this section means that a failure to perform or enforce, in good faith, a specific duty or obligation under the contract, constitutes a breach of that contract or makes unavailable, under the particular circumstances, a remedial right or power.  This distinction makes it clear that the doctrine of good faith merely directs a court towards interpreting contracts within the commercial

12

context in which they are created, performed, and enforced, and does not create a
separate duty of fairness and reasonableness which can be independently breached.

Id. cmt. 1.  See also Peacock v. Damon Corp., 458 F. Supp. 2d 411, 419 (W.D. Ky. 2006) ("K.R.S.

§ 355.1-203 does impose an obligation of good faith in the performance of any contract or duty

within the Kentucky Uniform Commercial Code.  However, it does not create an independent cause

of action.").   Summary judgment dismissing each party's claim under this cause of action is

therefore warranted.

## E.  Conversion

Holley alleges that Smith-CNC converted Holley's toolings by repossessing them after

Holley requested that the toolings be returned to it.  Holley moves for summary judgment on

grounds that it is entitled to judgment in its favor as a matter of law.  To establish a prima facie case

of conversion, Holley must plead and prove that "'(1) the plaintiff had legal title to the converted

property; (2) the plaintiff had possession of the property or the right to possess it at the time of the

conversion; (3) the defendant exercised dominion over the property in a manner which denied the

plaintiff's rights to use and enjoy the property and which was to the defendant's own use and

beneficial enjoyment; (4) the defendant intended to interfere with the plaintiff's possession; (5) the

plaintiff made some demand for the property's return which the defendant refused; (6) the

defendant's act was the legal cause of the plaintiff's loss of the property; and (7) the plaintiff suffered

damage by the loss of the property.'"  Meade v. Richardson Fuel, Inc., 166 S.W.3d 55, 58 (Ky. Ct.

App. 2005) (quoting Ky. Ass'n of Counties All Lines Fund Trust v. McClendon, 157 S.W.3d 626,

632 n.12 (Ky. 2005)).

As to the issue of liability, the Court agrees with Holley that there is no genuine issue of

material fact and that Holley is entitled to judgment in its favor as a matter of law.  Smith-CNC does

not dispute that the plain and unambiguous terms of the Contract provided that Holley is the owner of the toolings.  (Contract § L.)  Smith-CNC also does not dispute that it "repossessed" the toolings under Kentucky's mold lien statute.  In previously dismissing Smith-CNC's claim under the mold lien statute, this Court held:

> The factual allegations of the counterclaim make it clear that Smith-CNC was not the manufacturer of products and that it only acted as a broker, or middleman, between Chinese manufacturers and Holley.  Smith-CNC's "use" of the dies in question is not the type of "use" envisioned by the statute.  Therefore, the Court holds that Smith-CNC is not a "molder" under the Kentucky lien statute and, therefore, has not stated a claim upon which relief can be granted.  Accordingly, the Court need not consider whether and how the notice requirements of the statute apply to Smith-CNC. Holley's motion to dismiss this claim is granted.

[DN 55 at 5].  Smith-CNC now contends that, although it may not have had authority under the mold lien statute to repossess the toolings, it did so in good faith.  Smith-CNC also argues that any further detention of the toolings after the Court ordered that they be returned was caused by third-parties not under Smith-CNC's control.  Smith-CNC correctly notes that the jury, not the Court, is the one to test the credibility of Smith's testimony in this regard.  However, in awarding summary judgment in favor of Holley, the Court need not test the credibility of Smith's testimony.  First, "repossessing" property without authority is a conversion and there is no "good-faith" exception.  See State Auto. Mut. Ins. Co. v. Chrysler Credit Corp., 792 S.W.2d 626, 627-628 (Ky. Ct. App. 1990) ("neither motive, intent, nor good faith is material to the action.") (citing Urban v. Lansing's Adm'r, 238 Ky. 218, 39 S.W.2d 219 (1931)).  Second, once Smith-CNC converted the property, it was immaterial as to whether the property subsequently came into possession of another wrongdoer because at the time of the conversion, Smith-CNC became liable for the fair market value of the property.  Batson v. Clark, 980 S.W.2d 566, 575 (Ky. Ct. App. 1998).  Although the property was eventually returned to Holley, Smith-CNC is still liable for conversion, see David J. Leibson, 13 Kentucky Practice

Series: Tort Law § 8:1; Dan B. Dobbs, Dobbs Law of Remedies § 5.14(4), p. 870-871, but Holley's damages are reduced by the value of the property at the time it was returned, id. Therefore, there being no dispute that Smith wrongfully exercised dominion and control over the property when he admittedly "repossessed" the toolings, summary judgment in favor of Holley as to liability is appropriate.

Smith-CNC moves in limine to prevent Holley from introducing, to this Court or at trial, evidence related to damages that Holley suffered as a result of Smith-CNC's conversion. Smith-CNC, while providing no citation to case law to support its position, contends that because Holley did not seek damages as part of the Court's contempt Order, Holley has waived any right to seek damages in its action for conversion. The contempt Order, however, was intended to compensate Holley, not for Smith-CNC's conversion, but for violating the Court's Order. There is no reason that Holley should not be allowed to prove damages as a result of Smith-CNC's conversion. Alternatively, Smith-CNC moves for partial summary judgment on Holley's conversion claim because Holley has not presented evidence of damages. The Court finds Smith-CNC's argument unpersuasive. First, Holley presented evidence that it incurred attorney fees prior to November 15, 2006 in an effort to recover possession of the tooling. As part of the Court's contempt Order, the Court did not award these fees to Holley because they were incurred prior to Smith-CNC's contempt. However, if such fees were incurred to regain possession of the toolings, they are compensable in this action. See Motors Ins. Corp. v. Singleton, 677 S.W.2d 309, 315 (Ky. Ct. App. 1984) (citing 18 Am. Jur. 2d Conversion §§ 95, 98). Furthermore, consequential and incidental damages, particularly damages that Holley incurred to mitigate its damages, are compensable in a conversion action.   See id. at 314 (permitting a plaintiff in a conversion action to recover

consequential and incidental damages in addition to the fair market value of the converted chattel). Here, Holley has presented evidence that it has suffered damages of at least $20,000.00 when it started the process of manufacturing a new tooling.  (See Pl.'s Ex. 29.)  Therefore, Smith-CNC's motions as to Holley's conversion claim will be denied.

## IV.  CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that

1.     The motion by the plaintiff, Holley Performance Products, Inc. [DN 93] for partial summary judgment is **GRANTED in part** and **DENIED in part**.  Consistent with the Court's Memorandum Opinion, the plaintiff's motion is granted with respect to the defendants' claim for tortious interference, the defendants' claim for breach of the implied covenant of good faith and fair dealing, and as to liability on the plaintiff's claim for conversion.  It is denied in all other respects.

2.     The motion by the defendants, Smith-CNC China Networking Co., SmithCNC, LLC, and Douglas R. Smith [DN 86] for partial summary judgment and other relief is **GRANTED in part** and **DENIED in part**.  The defendants' motion is granted as to Holley's claims for defamation.  It is denied in all other respects.

3.     The plaintiff's claim for breach of the implied covenant of good faith and fair dealing is **DISMISSED**.

4.     The motion by the defendants, Smith-CNC China Networking Co., SmithCNC, LLC, and Douglas R. Smith [DN 108] for oral arguments is **DENIED**.

cc:     Counsel of Record                16